UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
TARA ALAMEDA, KAMECA BALAN,
DEBBIE HAMELL-PALMER, on their own behalves
and on behalf of a class of similarly situated persons,          23-cv-6156 (KMK)

                           Plaintiffs,

      -against-

ASSOCIATION OF SOCIAL WORK BOARDS,

                        Defendant.
-------------------------------------------------------------------x


# MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS


                                SUSSMAN & GOLDMAN
                                *Attorneys for Plaintiff*
                                1 Railroad Avenue, Ste. 3
                                P.O. Box 1005
                                Goshen, New York 10924


Dated: January 5, 2024

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 1

STANDARD OF REVIEW ........................................................................................................ 4

ARGUMENT ............................................................................................................................... 5

    Point I

    Plaintiffs may hold ASWB liable under Title VII. .................................................. 5

        A. ASWB may be held liable as a covered "employer" under Title VII ..................... 5

        B. ASWB may be held liable as a covered "employment agency" under Title VII...14

    Point II

    Plaintiffs may hold ASWB liable under the NYSHRL ....................................... 14

    Point III

    The FAC amply alleges a minimal inference of intentional race discrimination
    sufficient to state a claim under Section 1981 ................................................. 17

    Point IV

    If necessary, plaintiffs should be granted leave to amend their complaint ........................ 24

CONCLUSION ............................................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Association of Mexican-American Educators v. California,*
    231 F.3d 572 (9th Cir. 2000) ........................................................................8, 10

*Ashcroft v. Iqbal,*
    566 U.S. 662 (2009) ...........................................................................................4

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................................4

*Burgis v. New York City Dep't. of Sanitation,*
    798 F.3d 63 (2d Cir. 2015) ...............................................................................20

*Clyburn v. Shields,*
    33 Fed.App'x. 552 (2d Cir. 2002) .............................................................19, 23

*Cresci v. Mohawk Valley Cmty. College,*
    2017 U.S. App. LEXIS 9749 (2d Cir. Jun. 2, 2017) ........................................24

*Felder v. United States Tennis Ass'n.,*
    2018 U.S. Dist. LEXIS 1855084 (S.D.N.Y. Oct. 30, 2018). .............................13

*Gill v. Monroe County Dep't. of Soc. Servs.,*
    79 F.R.D. 316 (W.D.N.Y. 1978).........................................................................7

*Griffin v. Sirva, Inc.,*
    29 N.Y.3d 174 (2017) ................................................................................15, 16

*Gulino v. N.Y. State Educ. Dep't.,*
    460 F.3d 361 (2d Cir. 2005). .......................................................8, 9, 10, 11, 12

*Hazlewood Sch. Dist. v. United States,*
    433 U.S. 299 (1977).........................................................................................21

*Littlejohn v. City of New York,*
    795 F.3d 297 (2d Cir. 2015) .............................................................................18

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
    797 F.3d 160 (2d Cir. 2015) .............................................................................24

*Manley v. Texas,*
    107 F.Supp.3d 712 (S.D. Tex. 2015) ..........................................................19, 23

*NOW v. State Division of Human Rights,*
    34 N.Y.2d 416 (1974) ...........................................................................................16

*Pers. Adm'r. of Mass. v. Feeney,*
    442 U.S. 256(1979)........................................................................................19, 20

*Raymond v. City of New York,*
    317 F.Supp.3d 746 (S.D.N.Y. 2018) ...........................................................19, 22

*Richardson v. City of New York,*
    2018 U.S. Dist. LEXIS 168208 (S.D.N.Y. Sept. 28, 2018)....................17, 18, 20

*Salamon v. Our Lady of Victory Hosp.,*
    514 F.3d 217 (2d Cir. 2008) ...........................................................................10

*Selevan v. New York Thruway Authority,*
    584 F.3d 82 (2d Cir. 2009) ..............................................................................4

*Sibley Memorial Hospital v Wilson,*
    488 F.2d 1338 (D.C. Cir. 1973).....................................................................5, 12

*Spirit v. Teachers Ins. Annuity Ass'n.,*
    691 F.2d 1054 (2d Cir. 1982) ......................................................................7, 8, 13

*State Farm Mut. Auto Ins. Co. v. Fayda,*
    2015 U.S. Dist. LEXIS 162164 (S.D.N.Y. Dec. 3, 2015) ................................18

*United States v. City of New York,*
    717 F.3d 72 (2d. Cir. 2013) ....................................................................17, 20, 21, 22

*United States ex rel Hart v. McKesson Corp.,*
    602 F.Supp.3d 575 (S.D.N.Y. 2022) ...............................................................25

*Vanguard Justice Society,*
    471 F.Supp. 670 (D.Md. 1979)........................................................................7

*Vega v. Hempstead Unio Free School District,*
    801 F.3d 72 (2d Cir. 2015) .............................................................................18

## Statutes

42 U.S.C. § 1981(b).............................................................................................17

42 U.S.C. § 2000e(b) ...........................................................................................5

42 U.S.C. § 2000e(c) ...........................................................................................14

42 U.S.C. § 2000e(f)............................................................................................................5

42 U.S.C. § 2000e-2(a)(1) ...........................................................................................5, 11, 12

42 U.S.C. § 2000e-2(a)(2) ...............................................................................................5, 11

42 U.S.C § 2000e-2(b)......................................................................................................14

N.Y. Exec. L. § 296(1)(a) ..............................................................................................15, 17

N.Y Exec. L. § 296(6)....................................................................................................15, 16

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 8(a)(2).........................................................................................................4

Fed. R. Civ. P. 12(b)(6) ......................................................................................................4

Fed. R. Civ. P. 15(a)(2)......................................................................................................24

**Other Authorities**

EEOC Compliance Manual, Volume 2: Threshold Issues, Section 2-III(B)(3)(a) [Covered Entities: Third Party Interference with Employment Opportunities] (2000)..................................6

EEOC Policy Statement on Control by Third Parties over the Employment Relationship between an Individual and his/her Direct Employer (1987)...........................................................7

## PRELIMINARY STATEMENT

Plaintiffs Tara Alameda, Kameca Balan, and Debbie Hamell-Palmer brought this putative class action lawsuit against defendant Association of Social Work Boards ("ASWB") challenging ASWB's allegedly racially discriminatory examinations. They assert claims under Title VII, the New York State Human Rights Law ("NYSHRL") and 42 U.S.C. § 1981. ASWB has moved to dismiss under Fed. R. Civ. P. 12(b)(6). For the reasons that follow, the motion should be denied.

## STATEMENT OF FACTS[1]

Defendant ASWB develops, administers, and scores examinations used by nearly every state to license candidates as Licensed Master Social Workers ("LMSW") and Licensed Clinical Social Workers ("LCSW") (¶¶ 6, 30, 44-47).[2] In New York State, as in forty-six other states, individuals who wish to obtain such licensure and practice as an LMSW or LCSW must pass a test developed and administered by ASWB (¶¶ 30, 44-47). Accordingly, a candidate who does not pass ASWB's examinations cannot become licensed to practice as an LMSW or LCSW and, thus, cannot be employed in a position requiring this credential (¶ 32).

ASWB has not validated its examinations for the purposes for which it promotes and uses them – that is, to determine whether a person will succeed as an LMSW or LCSW (¶ 37). Moreover, its test results have long demonstrated significant disparities by race and national origin, measured at least as far back as 2011, though this was publicly known until August 2022 (¶ 37).

Indeed, as such statistical disparities demonstrate, African American and Latino/Latina test-takers are far less likely to pass ASWB's LMSW and LCSW examinations than are Caucasian

---

[1] This statement of facts derives from the factual allegations Plaintiff's First Amended Complaint ("FAC") and the reasonable inferences drawn therefrom and, for purposes of this motion, must be accepted as true. See *Selevan v. New York Thruway Authority*, 584 F.3d 82, 88 (2d Cir. 2009) (citations omitted).

[2] Citations to "¶ ____" refer to the FAC, annexed as Exhibit A to the Declaration of Jessica Ancona Semko, Esq., dated December 8, 2023, and docketed as ECF Doc. No. 23.

test-takers (¶ 38).    After years of intentionally withholding these pass rates despite specific requests, in August 2022, ASWB finally released this data, confirming significant racial disparity in outcomes for its non-validated examinations administered between 2011 and 2021 (¶ 39).

For instance, for the LCSW examinations administered between 2018-2021, in the United States, 84% of White test-takers passed the exam on their first attempt, while only 45% of Black test-takers and 65% of Hispanic test-takers passed on their first attempts (¶ 40).  In its August 2022 report, ASWB also presented "eventual pass rate data," for its LCSW examinations from 2018-2021, inclusive, which showed a similar pattern – 91% of White test-takers eventually passed, while only 57% of Black test-takers and 76% of Hispanic test-takers did so (¶ 41).

The results of the LMSW examinations present similar significant racial disparities – while 88% of White first-time test-takers passed, only 42% of Black test-takers and 62% of Hispanic test-takers passed on their first attempt (¶ 42).  The "eventual pass rates" for these same groups on the LMSW examination were 91%, 52%, and 71%, respectively (¶ 43).

Despite its knowledge that its non-validated tests lead to such significant racially-disparate results, substantially and adversely impacting African American and Hispanic LMSW and LCSW candidates, it has done nothing to effectively address this outcome, as evidenced by over a decade of such results and, in this way, has intentionally and knowingly contracted with test-takers to provide them with racially discriminatory licensing examinations (¶¶ 52, 53-56).

Plaintiff Tara Alameda is Latina and a graduate of Beach Channel High School [1999], the College of New Rochelle [B.A. June 2010] and Touro College [M.S.W. June 2013] (¶¶ 2, 13).  During her Master's Program, she successfully completed 1,200 hours of supervised internship as a social worker, but she has been unable to pass ASWB's licensing examination (¶ 14).  She last took ASWB's LMSW exam on April 22, 2022, resulting in a failing score of 88, where a score of

98 was required to pass (¶ 15). Alameda has taken an ASWB LMSW examination ten [10] times and intends to take it for the eleventh [11th] time in 2023 (¶ 16).

In January 2014, Alameda was employed as a school social worker and permitted to work under provisional certification she obtained in 2013; however, since she could not pass the LMSW examination and thereby obtain her license, she could not receive permanent certification and her employer terminated her employment effective July 1, 2021 (¶¶ 17-18). By then, she had worked at twelve [12] high schools, had satisfactory ratings, earned tenure, and sustained no discipline throughout her career as a school social worker (¶¶ 19). By dint of her failure to pass the licensing examination, Alameda has suffered considerable income and retirement losses, was demoted, embarrassed, and emotionally stressed (¶ 20). She has been unable to do the work she loves and has a passion to perform, all while remaining responsible for school loans that did not allow her to forward and maintain her career (¶ 20).

Plaintiff Kameca Balan is of Haitian descent and is dark-skinned (¶ 4); she graduated from Yeshiva University's Wurzweiler School of Social Work in May 2015 and currently works at Sunrise Manor Rehabilitation as a Director of Social Services, where she began in February 2022 (¶¶ 21-22). She has taken and failed the LMSW Level examination five [5] times, scoring between 82-85, last sitting for [and failing] the exam in August 2022 with a score of 85 (¶¶ 23, 24).

Balan's test scores have disallowed her from seeking numerous employment opportunities and significantly depressed her income (¶ 25). As a consequence of her failure to pass ASWB's exams, Balan can only obtain employment in a nursing facility; her passion is to become a school social worker or work with hospice patients, but only certain nursing facilities will hire her (¶ 26).

Plaintiff Hamell-Palmer graduated from an accredited social work program and has successfully discharged her duties and responsibilities in several social work positions; however,

she has repeatedly failed ASWB's LCSW exam, which has, resultingly, limited her professional employment opportunities and earning capacity (¶ 27-29).

Plaintiffs seek to represent a putative class of similarly-situated African American and Hispanic LMSW and LCSW candidates, who, by dint of ASWB's administration of a racially discriminatory examination regime, have been unable to pass their licensing examinations and obtain employment as an LMSW or LCSW.

### STANDARD OF REVIEW

In determining a motion for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court must liberally construe plaintiff's complaint, accept all factual allegations as true and draw all reasonable inferences in plaintiff's favor. *See Selevan v. New York Thruway Authority*, 584 F.3d 82, 88 (2d Cir. 2009) (citations omitted). The court must determine whether the complaint "state[s] a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This inquiry is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 566 U.S. 662, 679 (2009).

Where the factual content of the pleading "allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged," the pleading "has facial plausibility." *Id.* at 678. "The plausibility standard is not akin to a 'probability requirement,'" *see id.*, and, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts [pleaded] is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citations omitted). Indeed, a pleading need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Iqbal*, 566 U.S. at 678-79. If, accepting all well-pled factual allegations as true, the court finds the complaint "plausibly give[s] rise to an entitlement to relief," *see Iqbal*, 566 U.S. at 679, it must deny the motion.

4

# ARGUMENT

## Point I

### Plaintiffs may hold ASWB liable under Title VII.

ASWB contends that it cannot be held liable under Title VII because it is neither Plaintiff's "employer" nor an "employment agency." *See* Def. Mem. at 6-9.  Respectfully, the Court should reject its arguments.

#### A. ASWB may be held liable as a covered "employer" under Title VII.

As pertinent here, Title VII provides: "It shall be an unlawful employment practice for any employer . . . to fail or refuse to hire or to discharge *any individual*, or otherwise discriminate against *any individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). The statute defines the term "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . . ." *Id.* § 2000e(b).

While the statute applies only to the action of *an* employer, it does not specify that an employer is only liable for actions taken against *its own* employees.  Indeed, the statute defines, and elsewhere uses, the term "employee," *see* 42 U.S.C. §§ 2000e(f), 2000e-2(a)(2), but the plain text of the operative provision under which Plaintiffs sue here does not state that it is unlawful for an employer to discriminate against only *its own* employees, *see id.* § 2000e-2(a)(1).  Rather, by its own terms, Section 2000e-2(a)(1) prohibits an employer from discriminating against "*any* individual." *Id.* (emphasis added); *See also Sibley Memorial Hospital v Wilson*, 488 F.2d 1338, 1341 (D.C. Cir. 1973) ("The Act defines 'employee' as 'an individual employed by an employer,' but nowhere are there words of limitation that restrict references in the Act to 'any individual' as

comprehending only an employee of an employer.  Nor is there any good reason to confine the meaning of 'any individual' to include only former employees and applicants for employment, in addition to present employees.  Those words should, therefore, be given their ordinary meaning so long as that meaning does not conflict with the manifest policy of the Act.").

Thus, based upon its plain text, the statute should be read to apply to any person satisfying the statutory definition of employer (that is, one that engages in an industry affecting commerce and employs at least 15 employees) that discriminates, or causes discrimination, against *any individual* with respect to that individual's current or prospective employment.

This interpretation is consistent not only with Title VII's underlying policy – to extirpate employment discrimination from the national economy – but also with EEOC guidance interpreting the statute.  Published in 2000, EEOC's guidelines on "threshold issues" explains:

> In addition to prohibiting employers from discriminating against their own employees, Title VII, the ADEA, and the ADA *prohibit a covered third-party employer from discriminatorily interfering with an individual's employment opportunities with another employer.* While the third-party employer might, in some cases, be a joint employer, *the principle described here applies even where an employment relationship has never existed between the third-party employer and the individual*. This kind of liability is commonly known as "third-party interference."  The ADA specifically prohibits interference with rights protected under the statute.  While Title VII and the ADEA do not include comparable provisions, they prohibit discrimination against "individuals." *Therefore, a charging party need not necessarily be an employee of the employer that is accused of discriminatory interference.*

EEOC Compliance Manual, Volume 2: Threshold Issues, Section 2-III(B)(3)(a) [Covered Entities: Third Party Interference with Employment Opportunities] (2000) (emphasis added), *available online at,* https://www.eeoc.gov/laws/guidance/section-2-threshold-issues#2-III-B-2 (last visited Jan. 5, 2023).  For further guidance on this subject, the Compliance Manual refers to an earlier

Policy Statement on Control by Third Parties over the Employment Relationship between an Individual and his/her Direct Employer ("Policy Statement"). *See Id.*

In that Policy Statement, issued in 1987 under then Commissioner Clarence Thomas (an avowed textualist), the EEOC opined that "in order for there to be jurisdiction over a third party interferer, the relationship between the individual and his/her direct employer must be one of employment; that is, the individuals must be an employee or prospective employee of the direct employer and not an independent contractor." *See* Policy Statement, available online at, https://www.eeoc.gov/laws/guidance/policy-statement-control-third-parties-over-employment-relationship-between (last visited Jan. 5, 2024). The EEOC noted: (1) the third party must, itself, be a § 701(b) employer; (2) the individual's direct employer or prospective employer need *not* be a § 701(b) employer; and (3) the control exercised by the third-party interferer must have sufficient nexus to an employment (or prospective employment) relationship. *See Id.*

As to the third element the EEOC expressed its view "that a sufficient nexus will exist where the third party has the ability to thwart the creation or continuance of a direct employment relationship or where it has the ability to affect the terms, conditions, or privileges of employment." *Id.* Providing specific instances where courts have found as a sufficient nexus, the EEOC cited *Vanguard Justice Society*, 471 F.Supp. 670, 696-97 (D.Md. 1979) (control over design or administration of exams constitutes sufficient nexus to hold third party liable as "employer" under Title VII) and *Gill v. Monroe County Dep't. of Soc. Servs.*, 79 F.R.D. 316, 334 (W.D.N.Y. 1978) (state civil service department may be liable for claims by county employees, where it exercised exclusive control over examinations, thus "control[ling] access to the plaintiffs' job market").

This interpretation is also consistent with the Second Circuit's decision in *Spirit v. Teachers Ins. Annuity Ass'n.*, 691 F.2d 1054, 1063 (2d Cir. 1982), which held Title VII applies to

7

companies administering plaintiffs' life insurance plans even though they were not plaintiffs' employers and explaining, "it is generally recognized that the term employer as used in Title VII is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an employer of an aggrieved individual as that term has generally been defined at common law."

Here, following Title VII's plain text as interpreted by the EEOC, and consistent with *Spirit*, whether or not it directly employs Plaintiffs, ASWB does not dispute that it is an employer of its *own* employees under Title VII, and so it may be held liable if it interferes in the existing or prospective employment relationship of any individual on the basis of race. The FAC alleges that it has done just that – by knowingly and intentionally developing and administering racially discriminatory tests that deprive otherwise qualified minority LMSW and LCSW candidates an equal opportunity to gain licensure, a necessary credential to access vast swaths of employment opportunities. Indeed, Plaintiffs allege they have been denied such employment opportunities not only with their past and present employers, but also with prospective employers.

We anticipate that, in reply, ASWB will argue that Plaintiffs' interpretation is undermined by the Second Circuit's decision in *Gulino v. N.Y. State Educ. Dep't.*, 460 F.3d 361 (2d Cir. 2005). There, plaintiffs sued the New York City Board of Education ("BOE") and New York State Education Department ("SED") under Title VII, challenging the state's allegedly discriminatory licensing regime for teachers. The Court held that Title VII did not apply to SED.

In doing so, the Second Circuit reversed the district court's holding that SED could be held liable under Title VII under the interference test first enunciated in *Sibley* and, more specifically, as later adopted by the Ninth Circuit in *Association of Mexican-American Educators v. California*, 231 F.3d 572 (9th Cir. 2000) (*en banc*) ("*AMAE*"). *See Gulino*, 460 F.3d at 370-78. The Court

noted that it has "never adopted a broad riding of the *Sibley* interference test, and we decline to do so now." *Id.* at 374. It then criticized *Sibley's* interpretation of Title VII's text and concluded that, other than employers, employment agencies, and labor unions, "all other parties with a similar 'nexus' to a plaintiff's employment are excluded from the Title VII liability scheme." *Id.* at 375. And it noted that *Sibley's* test may raise constitutional concerns regarding federal regulation of inherent state police powers, and specifically relating to regulation of education. *See Id.* at 375-76.

The Court then wrapped up its discussion of *Sibley* as follows: "Fortunately, we need not explore the legitimacy of *Sibley's* view of Title VII and the constitutional concerns raised by the clear statement rule, for we are convinced that the statute does not apply to the State (and thus SED) in the context presented. We see no justification for embracing *Sibley's* reading of Title VII and its use of the interference test." *Id.* at 376.

It next explained, "even if we endorsed the *Sibley* test, we still could not affirm the district's court's wholesale application of *AMAE* because of key factual differences between this case and *AMAE.*" *Id.* It then distinguished *AMAE's* facts on the ground that California's role in its education system differed markedly form that of New York's, rendering its reasoning inapplicable. *Id.*

Finally, *Gulino* addressed the Circuit's prior decision in *Spirit*, which seems at tension with *Gulino's* discussion of *Sibley* because it expressly held that an entity that is not a plaintiff's employer *could* be held liable under Title VII. *See Id.* at 377-78. In doing so, it seemed to suggest that later Supreme Court and Second Circuit precedent cast doubt on *Spirit* and that *Spirit's* holding is limited to cases where an employer delegates a core function to a third party. *See Id.* But *Gulino* did not expressly abrogate or overrule *Spirit*.

Despite its lengthy and critical discussion of *Sibley* and its refusal to adopt or apply it, and given (1) that it did not overrule *Spirit*; (2) its comment that "we need not explore the legitimacy

of *Sibley's* view of Title VII and the constitutional concerns raised by the clear statement rule, for we are convinced that the statute does not apply to the State (and thus SED) in the context presented"; and (3) that it then placed heavy emphasis on distinguishing its facts from *AMAE*, we submit that *Gulino* did not foreclose a *Sibley*-type interference claim in this Circuit or the application of Title VII to an entity that is not a plaintiff's direct employer or prospective employer.

Indeed, just two years later in *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 233 (2d Cir. 2008), the Court, faced with a *Sibley*-type claim, suggested as much. *Gulino* was decided after the district court decision in *Salamon* was entered but before the appeal was decided. After noting *Gulino's* criticism of *Sibley*, the *Salamon* panel concluded: "We need not decide in this case whether *Gulino* closed the door entirely on the *Sibley* theory of interference liability in this Circuit, because the district court correctly concluded that Salamon has not established that her relationship with potential patients would constitute an employee-employer relationship." *Id.*  If the Court believed that *Gulino* definitively foreclosed such a claim, it could easily have said so.  But it did not, suggesting there was an open question it could avoid deciding by ruling on other grounds.

Based on the foregoing, we would urge this Court to find that *Gulino* does not foreclose an interference type claim against an entity that is not a plaintiff's direct employer or prospective employer.[3]  And to the extent it does so, but still considers *Gulino's* criticism of *Sibley*, we would respectfully submit that *Gulino's* reasoning is not sound.

First, *Gulino* cited Title VII's mandate that "[i]It shall be an unlawful employment practice for an employer  . . . to fail or refuse to hire or to discharge any individual [on the basis of membership in a protected class]," (alterations in original) and, following Judge Gould's dissent in *AMAE*, concluded that "a nature reading [of this provision] suggests that the 'individual it

---

[3] If the Court finds that *Gulino* forecloses an interference-type claim and that it is so bound by *Gulino* to reject Plaintiffs' Title VII claim, we include this argument to preserve it to later challenge *Gulino* on appeal.

references is a potential, current, or past employee of the employer,' and that a direct employment relationship is the typical case." *Id.* (citing 42 U.S.C. § 2000e-2(a)(1) and *AMAE*, 231 F.3d at 603).

But the Court did not explain *why* this would be the natural reading. Indeed, as already noted, Title VII defines and uses the term "employee" throughout and, if Congress truly intended the meaning Judge Gould and the *Gulino* panel suggests, it could have, and likely would have, written: "it is unlawful for an employer to fail or refuse to hire **an applicant for employment with it** or to discharge any **employee** . . . ." If it had done so, it would have been clear that this provision applies only with respect to past, current, or prospective employees of the particular employer.

Indeed, Congress used such language in the very next subparagraph, where it provides that it is unlawful for an employer "to limit, segregate, or classify **his employees or applicants for employment** in any way which would deprive or tend to deprive any individual or employment opportunities . . . ." 42 U.S.C. § 2000e-2(a)(2) (emphasis added). This language makes clear that Congress intended to limit the prohibition in this provision to what an employer could do with respect to *its own* employees or applicants for employment.

Further, when it cited the relevant statutory language, *Gulino* replaced with ellipses a key phrase – that it is also unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e(a)(1). This language is important because all of the words matter, and the statute must be read in its totality. More critically, this clause demonstrates its breadth, which further supports why a *Sibley*-type interference claim is properly covered by the statute. Again, Congress could have written that it is unlawful for an employer to discriminate against any of "**its employees**" or against "any individual in the terms, conditions or privileges of employment **with the employer**." But it did not, again, suggesting that it intended to allow claims against any entity satisfying the statutory

11

definition of "employer" and which discriminates against any individual with respect to (*i.e.*, as it relates to) that individual's employment, even if with another entity.

Moreover, other than summarily adopting Judge Gould's suggested "natural reading" of the statutory language, *Gulino* did not address *Sibley's* analysis of the specific statutory text, as explicated herein, *see also*, 488 F.2d at 1341. Nor did it address the EEOC guidance noted above.

Respectfully, *Gulino* also misread *Sibley's* reference to employment agencies and labor unions in its analysis. *Sibley* wrote: "We think it significant that the Act has addressed itself directly to the problems of interference with the direct employment relationship by labor unions and employment agencies – institutions which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties." 488 F.2d at 1342. To this, *Gulino* remarked: "This reading of Title VII, however, ignores the very language Congress employed. Congress did not mention labor unions or employment agencies as *examples* of additional potentially liable parties under Title VII. Nor did Congress extend Title VII liability in a general way; rather it limited the statute's additional liability to labor unions and employment agencies." 460 F.3d at 375 (emphasis in original).

But *Sibley* did not reference employment agencies and labor unions as mere examples of additional liable parties and suggest that this supported expanded liability to other *unenumerated* entities with similar relationships to an individual's employment. Rather, the import of its reference was that, with respect to employment agencies and labor unions, Congress addressed the issue of interference, and so, reading the statutory language of § 2000e-2(a)(1) (applicable to employers) in the way it had already explained the language is properly understood, it is reasonable to conclude that Congress also intended to address the issue of interference by *employers*. In other words, that Congress prohibited employment agencies and labor unions from interfering with

individuals' employment relations with others suggests that, when it said it is unlawful for an employer to act in certain ways toward "any individual" with respect to that "individual's" employment without using restrictive language expressly limiting such prohibitions to the employer's *own* employees or applicants, it intended to also prohibit *employers* (an enumerated category expressly covered by the Act) from interfering with individuals' employment relationships with others.

Moreover, to the extent it relied on distinguishing its facts from *AMAE* and the fact that SED was acting as regulator under its police powers, *Gulino* is distinguishable from the instant case because ASWB is not a sovereign exercising regulatory powers, and so the same constitutional/federalism concerns are absent here.

Finally, if his Court finds *Gulino* forecloses a *Sibley*-type interference claim in the context of Plaintiffs' allegations and that it is so bound, we submit that a claim against a third party may still lie under *Spirit*, where a direct employer, or prospective employer, delegates to the third party a core employer function. Indeed, Judge Ramos read *Gulino* in this way, noting that, "to bring a post-*Gulino* claim of interference liability in this Circuit, Plaintiff would need to allege that his employer had delegated a 'core' employment function to a third party who acted toward him in an unlawful manner." *Felder v. United States Tennis Ass'n.*, No. 17-cv-5045, 2018 U.S. Dist. LEXIS 185508, at *11 n. 4 (S.D.N.Y. Oct. 30, 2018).

And here, the FAC amply pleads that, by dint of each state's licensing requirement for individuals seeking to work as LMSWs or LCSWs, all employers of such professionals delegate to ASWB the core employment function of developing and administering the text necessary to gain licensure and, thus, the appropriate credential to obtain such employment. Thus, under *Spirit*, Plaintiffs' Title VII claim against ASWB is valid.

**B. ASWB may be held liable as a covered "employment agency" under Title VII.**

Title VII provides that it "shall be an unlawful practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race . . . ." 42 U.S.C § 2000e-2(b). The statute defines the term "employment agency" as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person." *Id.* § 2000e(c).

Here, the FAC alleges that, by administering the test necessary to obtain licensure and, thus, employment as an LMSW or LCSW, ASWB is in the business of procuring for employees the opportunity to be able to work for various employers of such professionals.

ASWB responds that, "[f]ollowing plaintiff's logic, any third party involved in any way with an individual's educational and professional path to employment as a social worker would be deemed an 'employment agency,' which is a ludicrous result." Def. Mem. at 9. But Plaintiffs' argument does not go that far. ASWB's role in the process is much closer (both in time and in substance) to the employment relationship than a mere educational institution or another entity involved in one's career path that may be more temporally or substantively attenuated from one's employment. Moreover, the test taking process is a necessary component of the employment process – the test provides the final pathway to licensure, which is necessary for employment. Thus, by providing the test, ASWB provides (and thus procures) employment opportunities.

## Point II

### Plaintiffs may hold ASWB liable under the NYSHRL.

Plaintiffs claim that, by knowingly and intentionally administering racially discriminatory examinations, depriving them of an equal opportunity to pass and obtain licensure to gain

employment as an LMSW or LCSW, ASWB has violated their rights under the NYSHRL. ASWB responds that it cannot be held liable under this statute because it is neither Plaintiffs' employer nor an employment agency. *See* Def. Mem. at 9-11. But its argument fails.

Irrespective of how the Court decides the Title VII issue, it is clear that the NYSHRL is a different statute with its own provisions and, as pertinent here, by its plain terms, applies to those who are not a direct employer of the aggrieved plaintiff. Specifically, the statute makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y Exec. L. § 296(6).

As the New York Court of Appeals has made clear, Section 296(6) "extends liability to an out-of-state nonemployer who aids or abets employment discrimination . . . ." *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 186 (2017). More specifically, *Griffin* explained:

> Section 296(6) extends liability to persons and entities beyond joint employers, and this provision should be construed broadly. Section 296(6) applies to any "person." Unlike Section 296(15), nothing in the statutory language or legislative history limits the reach of this provision to employers. Indeed, the purposes of subdivision (6) was "to bring within the orbit of the bill all persons, no matter what their status, who aid or abet any of the forbidding practices of discrimination or who attempt to do so," as well as "to furnish protection to all persons, whether employers, labor organizations, or employment agencies, who find themselves subjected from any source to compulsion or coercion to adopt any forbidding employment practice.

*Id.* at 187.

As pertinent here, under the NYSHRL, it is a forbidden practice[] of discrimination," *id.*, for an "employer or licensing agency, because of an individual's . . . race . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. L. § 296(1)(a). As such, it is also unlawful for *any person* – whether or not an employer and whether

in state or out – to "aid, abet, incite, compel or coerce" an employer or licensing agency in such action. *See Id.* § 296(6) (emphasis added); *Griffin*, 29 N.Y.3d at 186.

The well-pled factual allegations of Plaintiff's FAC amply state a claim that ASWB aids and abets employers of LMSWs and LCSWs in New York State, including Plaintiffs past, present, and prospective employers, in discriminating on the basis of race by limiting the qualified applicant pool for such employment on the basis of race through its provision of racially discriminatory examinations, which racial minorities fail at disproportionately high rates. Put differently, because ASWB deprives otherwise qualified African American and Hispanic LMSW and LCSW candidates an equal opportunity to gain licensure in these fields on the basis of their race, it causes employers of LMSWs and LCSWs to refuse to hire such candidates on that same basis.

In this regard, the New York Court of Appeals' decision in *NOW v. State Division of Human Rights*, 34 N.Y.2d 416 (1974), is instructive. There, NOW filed a State DHR complaint against Gannett Publishing, Inc. ("Gannett"), a newspaper publisher, claiming that its policy of "maintain[ing] separate columns in newspaper classified advertising for male employment and female employment . . . violat[ed] [N.Y. Exec. L. § 296(6)]." *Id.* at 418. Reversing the DHR's dismissal of this complaint, the Court recognized, *inter alia*, that gender-separated want ads allowed employers to continue paying women less for "female" jobs, in-turn perpetuating gender discrimination in the workplace. *See Id.* at 421. And, while Gannett could not be held liable as an employer, "since it published its want ads under separate sex designations . . . it aided and abetted sex discrimination, and such aiding and abetting is condemned by [Section 296(6)]." *Id.*

Likewise, here, when an otherwise qualified candidate is unable to gain employment in her chosen field because of her failure to obtain necessary licensure, and the ability to gain such licensure is denied due to race, the denial of employment itself is thus also based on race. And

16

here, like Gannett's want ads in NOW, ASWB's racially discriminatory examinations aid and abet this workplace race discrimination by causing, on the basis of race, the denial of the licensure necessary to gain such employment.

Further, and in addition to its impact on employers, ASWB's practice separately aids and abets the State of New York as a licensing agency – another type of entity covered by the NYSHRL – in discriminating against otherwise qualified candidates in the attainment of LMSW and LCSW licensure, thereby barring them from employment as such. *See* N.Y. Exec. L. § 296(1)(a) (applying to employers *and* licensing agencies).

In short, even if ASWB is not Plaintiffs' employer, it may still be held liable to Plaintiffs under the NYSHRL, and so its motion to dismiss this claim should be denied.

## **Point III**

### **The FAC amply alleges a minimal inference of intentional race discrimination sufficient to state a claim under Section 1981.**

Section 1981 protects the rights of racial minorities in the "making, performance, modification, and termination contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). "To assert a pattern or practice that violates Section 1981, a plaintiff must plausibly allege that intentional racial discrimination was the defendant's standard operating procedure, the regular rather than the unusual practice, and that the discrimination was directed at a class of victims." *Richardson v. City of New York*, No. 17-cv-9447, 2018 U.S. Dist. LEXIS 168208, at \*15-16 (S.D.N.Y. Sept. 28, 2018) (cleaned up) (quoting *United States v. City of New York*, 717 F.3d 72, 83 (2d. Cir. 2013)).

"When bringing a Section 1981 pattern-or practice claim, the plaintiff bears the initial burden of presenting a prima facie case, which requires that the plaintiff produce sufficient evidence to create a rebuttable presumption of the existence of the employer's pervasive practice

of intentional discrimination." *Id.* (citations omitted). "To make a prima facie showing, the plaintiff need not initially show discrimination against any particular present or prospective employee . . . [,] [r]ather, a statistical showing of disparate impact might suffice." *Id.* (citations omitted). "To survive a motion to dismiss, though, a complaint need not establish a prima facie case of . . . discrimination . . . . Instead, the complaint need only carry the minimal burden of providing at least minimal support for the proposition that the [defendant] was motivated by discriminatory intent." *Id.* (quotations omitted) (citing *Vega v. Hempstead Unio Free School District*, 801 F.3d 72, 85 (2d Cir. 2015) and *Littlejohn v. City of New York*, 795 F.3d 297, 310 (2d Cir. 2015)).

Plaintiffs' FAC carries their initial burden of alleging at least minimal support for the proposition that ASWB intended to discriminate. Specifically, it alleges that, for years, ASWB administered non-validated tests that yielded significant and staggeringly disparate results as between Caucasian test-takers and Black and Hispanic test-takers, with first time Black test-takers passing at about half the rate as Whites and first time Hispanic test takers at under two-thirds the rate of Whites, with similarly dismal "eventual pass-rate" disparities as between these racial groups. The fact that these disparities consistently occurred over more than a decade strongly suggests that, despite its knowledge of this, ASWB failed to employ effective measures to address this impact, thereby intending these outcomes to persist. This inference of intentional discrimination is further supported by the allegation that, despite repeated requests, until August 2022, ASWB consistently resisted disclosing these pass rates, suggesting a consciousness of guilt, which can be probative of unlawful intent. *See State Farm Mut. Auto Ins. Co. v. Fayda*, No. 14-cv-9792, 2015 U.S. Dist. LEXIS 162164, at *12-*13 (S.D.N.Y. Dec. 3, 2015) (recognizing that

evidence of efforts to conceal can demonstrate consciousness of guilt, which can be probative of unlawful intent).

ASWB argues these allegations, which may be sufficient to establish a disparate impact, fail to raise an inference of intentional discrimination. *See* Def. Mem. at 13-15. They argue that "discriminatory intent requires more than intent as volition or intent as awareness of consequences; it involves a decision maker's undertaking a course of action becau*se of, not merely, in spite of,* the action's adverse effects upon an identifiable group." *Id.* at 13 (citations omitted) (emphasis in original). They contend that the FAC falls short of this standard, and in support of this argument, rely heavily on *Raymond v. City of New York*, 317 F.Supp.3d 746, 761 (S.D.N.Y. 2018), *Clyburn v. Shields*, 33 Fed.App'x. 552, 555 (2d Cir. 2002) (summary order), and *Manley v. Texas*, 107 F.Supp.3d 712 (S.D. Tex. 2015). Respectfully, its arguments are flawed and should be rejected.

First, the proposition that purposeful discrimination occurs "because of, not merely in spite of its adverse effects upon an identifiable group," derives from the Supreme Court's decision in *Pers. Adm'r. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). But *Feeney* added a very important footnote to this point:

> This is not to say that the inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent. *Certainly, when the adverse consequences of a law upon an identifiable group are as inevitable as the gender-based consequences of [the challenged law here], a strong inference that the adverse effects were desired can reasonable be drawn.* But in this inquiry – made as it is under the Constitution – an inference is a working tool, not a synonym for proof. When, as here, the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when, as here, the statutory history and all of the available evidence affirmative demonstrates the opposite, the inference simply fails to ripen into proof.

*Id.* at 279 n. 25 (emphasis added).   In other words, the Court expressly recognized that a defendant's knowledge of a significant discriminatory disparate impact can raise a "strong inference" of discriminatory intent.  It simply held that, on a full record in that particular case, this permissible inference was overcome by other evidence and failed to carry the ultimate burden.

But on a motion to dismiss, as here, plaintiffs need not carry their ultimate burden – rather, they must only plausibly raise a minimal inference of discriminatory intent. *See Richardson*, 2018 U.S. Dist. LEXIS 168208 at *19 ("To be sure, no one of Plaintiffs' allegations constitutes a smoking gun, nor does the complaint taken as a whole compel the conclusion that the City has exhibited a practice of intentional racial discrimination.  But Plaintiffs need not even make out a primary facie case of discrimination.  Instead, they need only raise a reasonable expectation that discovery will reveal evidence of illegality." (citations omitted and cleaned up)).  And, by the plain terms of *Feeney's* Footnote 25, evidence of significant disparity in outcome can raise a "strong inference" of discriminatory intent. *See* 442 U.S. at 279 n. 25; *See also Burgis v. New York City Dep't. of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015) (holding that, in class action pattern-or-practice claims against an entity, "in certain circumstances . . . statistics alone may be sufficient" to "warrant a plausible inference of discriminatory intent if they show a pattern or practice that cannot be explained except on the basis of intentional discrimination.").  As explained above, they have done so, entitling them to discovery on this issue.

Also instructive here is the Second Circuit's decision in *United States v. City of New York, supra*.  There, the United States sued the City of New York under Title VII, alleging, *inter alia*, that the FDNY's administration of employment examinations had a disparate impact on minority applicants. *See* 717 F.3d at 76-78.  For one examination, the pass rate for Whites was 89.9% and only 60.3% for Blacks, and for another, Whites passed at a 97.2% rate, while Blacks passed only

at an 85.4% rate. *Id.* at 78. In addition to the Government's disparate impact claim, other interested parties intervened as plaintiffs, who asserted additional claims, including, as pertinent here, a disparate treatment claim under Title VII and claims under 42 U.S.C. § 1981 and 1983 against the Mayor and then-Fire Commissioner individually. *See Id.* at 78-79, 92-94.

As pertinent here, the district court granted summary judgment to plaintiffs on their disparate impact and disparate treatment Title VII claims but dismissed the Section 1981 and 1983 claims against the Mayor and Fire Commissioner on qualified immunity grounds. On appeal, the defendants did not challenge the grant of summary judgment to plaintiffs on the disparate impact claim, and they conceded that plaintiffs had established a *prima facie* case of intentional discrimination on their disparate treatment claim.

In evaluating the Title VII disparate treatment claim, the Second Circuit explained that, in establishing a *prima facie* case in pattern-and-practice claims, plaintiffs are not required to show specific instances of discrimination against a particular person, rather "a statistical showing of disparate impact might suffice." *Id.* at 84 (citing *Hazlewood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977)). Thus, "[t]he statistical disparities supporting the unchallenged finding that the Exams had a racially disparate impact also served to establish a prima case on the Intervenors' claim of a pervasive pattern of discriminatory treatment, especially in light of the long-standing pattern of low minority participation in the FDNY." *Id.* at 88 (citing *Hazlewood Sch. Dist.*, 433 U.S. at 307-08 ("Where gross statistical disparities alone can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.")).[4]

---

[4] The Second Circuit ultimately reversed grant of summary judgment to plaintiffs on their Title VII disparate treatment claim, not because of the failure of plaintiff's statistical evidence to establish a *prima facie* case, but rather because there remained questions of fact as to the City's rebuttal thereto.

The Second Circuit also reversed dismissal of the Section 1981 and 1983 claims against the Fire Commissioner. *See Id.* at 92-94. Noting *Feeney's* rule that "purposeful discrimination requires more than intent as volition or intent as awareness of consequences" and "instead involves a decision maker's undertaking a course of action because of not merely in spite of the action's adverse effects upon an identifiable group," *id.* at 93 (cleaned up), the Court also did "not doubt that the failure of senior officials [with knowledge of a disparate impact] to act can support an inference of discriminatory intent in some circumstances, particularly where they are in a position to avoid likely unconstitutional consequences." *Id.* at 94. And, while on the summary judgment record developed in that case, it did not "believe that the cited omissions of the [relevant officials] sufficient to support a reasonable inference they declined to act *because* they wanted to discriminate against black applicants," *id.* (emphasis in original), it concluded that a reasonable factfinder could infer that the Fire Commissioner's "decision to continue using the results of the Exams with awareness of their disparate impact . . . indicated an intent to discriminate." *Id.*

Again, and given the foregoing, at the motion to dismiss stage here, Plaintiffs' allegations in the FAC raise a minimal inference of discriminatory intent.

Further, the cases ASWB cites to support its argument are unavailing. In *Raymond*, while the district cited *Feeny's* standard for purposeful discrimination, it also expressly recognized the Second Circuit's holding in *Burgis*, that statistics demonstrating significant racial disparity *can* raise an inference of intentional discrimination. *See* 317 F.Supp.3d at 761. It simply found that plaintiffs' statistics failed to plausibly demonstrate that the cited disparities reflected racial discrimination rather than some other legitimate reason. *See Id.* at 762-63. In this regard, plaintiffs alleged racial disparity in discipline, and while they cited raw statistical disparities in disciplinary

outcomes, they did not allege facts regarding the various facts and circumstances relevant to disciplinary determinations of member of the respective racial groups. *See Id.*

By contrast, here, Plaintiffs do not challenge the implementation of employment practices, like disciplinary actions, which involve consideration of numerous factors [some of which are subjective] and varying circumstances. Rather, they challenge the administration of examinations that consistently and predictably have resulted in substantially racially disparate outcomes. And the statistical disparities in objective outcomes they cite are arguably even more significant than the statistical disparities cited by the plaintiffs in *Raymond*, such that the very staggering nature of these disparities may plausibly exclude as reasons potential factors other than race. Moreover, as noted above, in addition to the statistics they cite, Plaintiffs also support the inference of intentional discrimination with allegations that ASWB sought to conceal these outcomes, demonstrating a consciousness of guilt probative of its unlawful intent.

Likewise, *Clyburn* is inapposite. That non-precedential summary order, involved individual claims of discrimination, not a class-action pattern-or-practice claim. It also predates *Burgis* and *City of New York*, which acknowledge that a defendant's knowledge of significant racial disparities, along with sufficient statistics demonstrating such disparities, may plausibly raise an inference of intentional discrimination.

*Manely* is also unavailing to ASWB. First, this out-of-state district court case does not bind this Court and, in any event, is distinguishable. To the extent it cites *Clyburn* to support its holding, *Manley* suffers the same flaws as *Clyburn* – specifically, it does not involve a class-action pattern or practice claim, but rather a claim of individual discrimination. Nor does *Manely* address the holdings of *Burgis* or *City of New York* or *Feeneys'* footnote 25. Further, Manley challenged the law school's use of LSAT scores, which he alleged resulted in disproportionate outcomes for

23

African Americans. But it does not appear that he cited significant statistical disparities or that the law schools knew this fact and continued to use the tests anyway, which, if he had, might have sufficed to raise an inference of intentional discrimination. Moreover, other than challenging the *law school's* use of the test results, it does not appear that Manely challenged the *LSAT developers'* alleged creation and administration of a racially discriminatory examination, whereas, here, Plaintiffs do challenge the ASWB directly in its alleged deliberate decision to continue to administer a test they know, and have known for years, produces racially disparate outcomes.

In short, the FAC plausibly raises an inference of intentional discrimination under Section 1981, entitling them to discovery on this claim.

## Point IV

### If necessary, plaintiffs should be granted leave to amend their complaint.

Finally, should the Court determine that Plaintiffs have failed to plead sufficient facts to state any of their claims, they respectfully request the opportunity to cure this and to amend again. Indeed, under such circumstances, amendment should be freely granted, particularly because it is not until the district court issues its opinion that a plaintiff has ample notice of any deficiencies in her pleading giving rise for cause to seek to amend. *See* Fed. R. Civ. P. 15(a)(2) (leave to amend should be freely given when justice requires); *Cresci v. Mohawk Valley Cmty. College*, No. 15-3234, 2017 U.S. App. LEXIS 9749, at * 5-*6 (2d Cir. Jun. 2, 2017) (summary order) at *6. "The proper time for a plaintiff to move amend the complaint is when the plaintiff learns from the District Court in what respect the complaint is deficient." Cresci, 2017 U.S. App. LEXIS 9749 at 6. Indeed, it "is the District Court's ruling, not the defendant's arguments in support of a motion to dismiss, that puts a plaintiff on notice of the complaint's deficiencies." *Id.* at *7; *See also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

Here, Plaintiffs have acted in good faith, amending their complaint once in response to defendant's pre-motion letter and, in their view, curing any potential pleading deficiencies. But "[o]rdinarily, a plaintiff should be granted leave to amend at least once after having the benefit of a court's reasoning in dismissing the complaint." *United States ex rel Hart v. McKesson Corp.*, 602 F.Supp.3d 575, 598 (S.D.N.Y. 2022). This is particularly so if the Court were to find Plaintiff's underlying legal theories and methods sound but that their pleading lacks sufficient subsidiary facts to render their claims plausible. As such, if the Court finds the FAC lacks sufficient factual detail to allege any of Plaintiffs' claims or is otherwise wanting, respectfully, it should give Plaintiffs an opportunity to amend once more with the benefit of the Court's reasoning.

## CONCLUSION

For all of the foregoing reasons, ASWB's motion to dismiss should be denied in its entirety.

Dated: Goshen, New York
      January 5, 2024

                Respectfully submitted,

                SUSSMAN & GOLDMAN
                *Attorneys for Plaintiff*

                By: _____
                    Jonathan R. Goldman, Esq. (JG8710)
                    Michael H. Sussman, Esq. (3497)
                    1 Railroad Avenue, Ste. 3
                    P.O. Box 1005
                    Goshen, New York 10924
                    (845) 294-3991 [Tel]
                    (845) 294-1623 [Fax]
                    jgoldman@sussman.law
                    sussman1@sussman.law