UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TARA ALAMEDA, KAMECA BALAN, *and* DEBBIE HAMELL-PALMER, *each on their own behalf and on behalf of a class of similarly situated persons*,

                    *Plaintiffs*,

    v.

ASSOCIATION OF SOCIAL WORK BOARDS,

                    *Defendant*.

No. 23-CV-6156 (KMK)

ORDER & OPINION

---

Appearances:

Jonathan Robert Goldman, Esq.
Goldman Law, PLLC
Newburgh, NY
*Counsel for Plaintiffs*

Michael Howard Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiffs*

Jennifer Semko, Esq.
James Gilmore, Esq.
Baker & McKenzie LLP
Washington, DC
*Counsel for Defendant*

Jeffrey A. Sturgeon, Esq.
Kelechi Emem Okengwu, Esq.
Baker & McKenzie LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Tara Alameda ("Alameda"), Kameca Balan ("Balan"), and Debbie Hamell-Palmer ("Hamell-Palmer") (collectively, "Plaintiffs") bring this Action, on each's own behalf and on behalf of a class of similarly situated persons, against the Association of Social Work Boards ("ASWB" or "Defendant"), alleging claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), Section 1981 of the 1866 Civil Rights Act ("Section 1981"), and the New York State Human Rights Law ("NYSHRL").  (*See generally* Second Am. Compl. ("SAC") (Dkt. No. 37).)  Before the Court is Defendant's Motion to Dismiss (the "Motion").  (*See* Not. of Mot. (Dkt. No. 41).)  For the reasons below, the Motion is granted.

## I.  Background

A.  Factual Background

The following facts are drawn from Plaintiffs' Second Amended Complaint ("SAC"), all of which are assumed to be true for the purpose of resolving the instant Motion.  *Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024).[1]

ASWB is a non-profit organization whose members include government agencies in the United States, Canada, and certain overseas territories delegated with the authority to regulate the profession of social work in the interest of public protection.  *See About the Association of*

---

[1] "Judicial notice may be taken of documents that are 'integral to the complaint' such that the complaint 'relies heavily upon [the documents'] terms and effect.'"  *Broccoli v. Ashworth*, No. 21-CV-6931, 2025 WL 880550, at *2 (S.D.N.Y. Mar. 21, 2025) (alterations in original) (quoting *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462 (S.D.N.Y. 2020)); *see also Hadwan v. U.S. Dep't of State*, 139 F.4th 209, 219 (2d Cir. 2025) (noting that "a court may take judicial notice of documents incorporated by reference into a complaint" (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002))).  Accordingly, the Court takes judicial notice of "The Effects of Race/Ethnicity on Clinical Exam Outcomes," a report by Joy Kim, MSW, PhD, and Michael Joo, MSW, PhD, both of the Rutgers School of Social Work (the "Rutgers Study").  (*See* Decl. of Jennifer Ancona Semko, Ex. A (Dkt. No. 41-3).)

*Social Work Boards*, ASWB, https://www.aswb.org/about-aswb/ [https://perma.cc/DB6B-X9SN] (last visited August 20, 2025).² One of ASWB's principal functions is to develop, administer, and score exams used by government entities to license candidates as Licensed Master Social Workers ("LMSW") and Licensed Clinical Social Worker ("LCSW"). (*See* SAC ¶¶ 6, 57.) ASWB does not issue licenses to practice social work; rather, in the State of New York, applications for licensure in social work are evaluated and acted upon by the New York State Education Department ("NYSED"). (*See id.* ¶¶ 30, 91.) A passing score on an exam is one of several criteria used by state licensing agencies when evaluating applicants for licensure. (*See id.* ¶¶ 34, 35.)

Plaintiffs allege that, according to historical exam pass rate data released by ASWB in August 2022, test takers who are Black or Hispanic are "far less likely" to pass the exams than white test takers. (*See id.* ¶¶ 38–43.) "Upon information and belief," Plaintiffs contend that "ASWB has been aware for years that the passage rates for Black and [Hispanic] test-takers [were] significantly lower . . . than that of [w]hite test takers" and that "[ASWB] deliberately and intentionally withheld this information and failed to take any meaningful actions to address or remediate this problem." (*Id.* ¶ 50.)

Alameda is Hispanic, Balan is Haitian, and Hamell-Palmer is Black. (*Id.* ¶¶ 2, 4, 5.) Plaintiffs allege that each has taken and failed ASWB exams multiple times. (*See id.* ¶¶ 14–16, 23–24, 27.) As a result, they contend, none has been able to pursue employment as a social

---

² "A court may 'take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute, and it is capable of accurate and ready determination.'" *Shapiro v. Peacock TV*, No. 23-CV-6345, 2025 WL 968519, at *6 n.4 (S.D.N.Y. Mar. 31, 2025) (quoting *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 247 (S.D.N.Y. 2025)); *see also Hesse*, 463 F. Supp. 3d at 463 (taking judicial notice of information on a party's website and collecting cases).

worker and has been limited in terms of professional opportunities and earning capacity. (*See id.* ¶¶ 19–20, 25–26, 29.)

B.  Procedural Background

The procedural background of this Action is summarized in this Court's previous Opinion & Order dated September 25, 2024, (the "2024 Opinion") dismissing Plaintiffs' First Amended Complaint. (*See* Op. & Order ("2024 Op.") (Dkt. No. 36) 3.)

On October 25, 2024, Plaintiffs filed the SAC. (*See* SAC.) On November 18, 2024, the Court set a briefing schedule. (*See* Dkt. No. 40.) On December 18, 2024, Defendant filed the instant Motion. (*See* Def's Mem. in Supp. ("Def's Mem.") (Dkt. No. 41-1).) After an extension, Plaintiffs filed their Opposition, (*see* Pls' Mem. in Opp. ("Pls' Opp.") (Dkt. No. 44)), and Defendant filed its Reply, (*see* Def's Reply Mem. in Supp. ("Def's Reply") (Dkt. No. 45)).

II.  Discussion

A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration adopted) (internal quotation marks and citation omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration adopted) (internal quotation marks and citation omitted). Rather, a complaint's "[f]actual

4

allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570. However, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also* Iqbal, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" (alteration adopted) (internal quotation marks and citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, as noted, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank*, 199 F.3d 99, 107

(2d Cir. 1999) (internal quotation marks and citation omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B.  Analysis

The SAC asserts four claims, all concerning alleged discrimination on the basis of race and national origin.  Specifically, Plaintiffs assert (1) disparate impact and (2) disparate treatment discrimination claims in violation of Title VII, and discrimination in violation of (3) Section 1981 and (4) NYSHRL.  The Court addresses each in turn.

1.  Title VII

Under Title VII, it is unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e–2(a).  "[T]he existence of an employer-employee relationship is a primary element of Title VII claims." *Felder v. U.S. Tennis Assoc.*, 27 F.4th 834, 838 (2d Cir. Mar. 7, 2022) (quoting *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006)).

Plaintiffs renew their argument that ASWB is liable under Title VII pursuant to a third-party interference theory.  (Pls' Opp. 6–10.)  Indeed, Plaintiffs copy the first half of their argument verbatim from their briefing on the first motion to dismiss.  (*Compare* Pls' Opp. 6–9 *with* Pls' Mem. in Opp. to Def's First Mot. to Dismiss (Dkt. No. 34) 5–8.)  Plaintiffs note the Court's previous rejection of this argument, but "include this argument to preserve their challenge to *Gulino* on appeal."  (Pls' Opp. 10.)

In its 2024 Opinion, the Court noted that the third-party interference theory "has not received a warm welcome in the Second Circuit."  (2024 Op. 7.)  Indeed, the Second Circuit has

6

held that the theory is only applicable to a third party where the entity "with the clear direct employment relationship" has "delegated a core employer responsibility" to the third party. *Gulino*, 460 F.3d at 378; *see also Popat v. Levy*, No. 15-CV-1052, 2024 WL 3652947, at *17 (W.D.N.Y. Aug. 5, 2024) (declining to find liability under the third-party interference theory where plaintiff failed to allege that any core employer responsibility had been delegated). (*See also* 2024 Op. 8 (finding that the theory did not apply because Plaintiffs "ha[d] not pled that their employers ha[d] delegated any core responsibilities to ASWB").) Now, Plaintiffs argue for liability on the theory that "employers of LMSWs and LCSWs have delegated to ASWB the core employment function of developing and administering the test used to qualify applicants for employment as LMSWs and LCSWs." (Pls' Opp. 10 (citing SAC ¶¶ 57–60).)

Plaintiffs' argument is unavailing. In *Spirt v. Teachers Insurance & Annuity Ass'n*, 691 F.2d 1054 (2d Cir. 1982), the Second Circuit held that the delegation of responsibility for the administration of a retirement plan sufficed to find third-party interference liability, *id.* 1063; *see also Gulino*, 460 F.3d at 377 (discussing *Spirt*). Specifically, the Second Circuit noted that the third parties "exist[ed] solely for the purpose of enabling [direct employers] to delegate their responsibility to provide retirement benefits for their employees." *Spirt*, 691 F.2d at 1063.

Here, in contrast, it is unclear how ASWB's development and administering of a test used for state licensure purposes is akin to any core employer responsibility *of the employer*. It is true that employers seeking to hire social workers must hire individuals who are licensed, but the employers do not have the ability to license individuals or to set the requirements of those licenses. Rather, New York state law sets the requirements for a social worker license, N.Y. Educ. Law § 7704, and provides for a "state board for social work" that is responsible for "assisting the board of regents and [NYSED] on matters of [social worker] professional

7

licensing, practice, and conduct," *id.* § 7703. The Court's review of the relevant state laws indicates that employers of licensed social workers have no responsibilities with respect to the social workers' license.

Plaintiffs argue that ASWB's developing and administering tests is akin to the core employer responsibility of "developing the standard used to measure whether an applicant is minimally qualified for the job." (Pls' Opp. 10.) But, as discussed above, this assertion elides the factual circumstances; here, employers who hire licensed social workers have no role in determining whether those individuals are qualified to obtain the relevant licenses. In other words, an employer of licensed workers is free to determine whether an applicant is minimally qualified for a job that requires a license, but the employer is not free to determine whether the applicant should be licensed.

Accordingly, because Plaintiffs have not established an employer-employee relationship with ASWB, their Title VII claim must be dismissed. *See Doe v. Golden Krust Caribbean Bakery & Grill Inc.*, No. 18-CV-5734, 2023 WL 2652264, at *4 (E.D.N.Y. Mar. 27, 2023) (dismissing Title VII claim where plaintiff failed to plausibly allege an employer-employee relationship).

2. Section 1981

"To plead a Section 1981 claim, 'a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate [on] the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.).'" *Joy v. Crime Victims Treatment Ctr.*, No. 23-CV-11177, 2025 WL 326521, at *10 (S.D.N.Y. Jan. 29, 2025) (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d

8

1085, 1087 (2d Cir. 1993)).  While the burden of establishing this prima facie case is "minimal," the plaintiff must also "plausibly allege that 'but for race, [they] would not have suffered the loss of a legally protected right.'"  *Moleon v. Alston*, No. 21-CV-1398, 2021 WL 5772439, at *8 (S.D.N.Y. Dec. 3, 2021) (quoting first *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993), then *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 333 (2020)).  It is not sufficient for a plaintiff merely to allege that race was a "motivating factor."  *Comcast*, 589 U.S. at 338 ("[N]owhere in its amendments to [Section] 1981 did Congress so much as whisper about motivating factors."); *id.* at 341 (holding that a Section 1981 plaintiff must allege but-for causation in their pleading).

As the Court previously noted, (*see* 2024 Op. 14), "broad statistical evidence, without evidence of specific instances of discrimination, is not relevant to whether any specific individual acted with discriminatory intent or whether any specific individual was the target of discrimination."  *Cardwell v. Davis Polk & Wardwell LLP*, No. 19-CV-10256, 2023 WL 2049800, at *24 (S.D.N.Y. Feb. 16, 2023) (alteration omitted) (quoting *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69 n.5 (2d Cir. 2015)).  Rather, "to show discriminatory intent in a [Section] 1981 or Equal Protection case based on statistics alone, the statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible nondiscriminatory explanations very unlikely."  *Raymond v. City of New York*, 317 F. Supp. 3d 746, 761 (S.D.N.Y. 2018) (first alteration omitted) (quoting *Burgis*, 798 F.3d at 69).

In its 2024 Opinion, the Court found that Plaintiffs failed to plausibly plead the intentional discrimination necessary for a Section 1981 claim, because "Plaintiffs' alleged data is a far cry from the kind of statistical evidence [c]ourts in the Second Circuit require in connection

with allegations of intentional discrimination to survive a motion to dismiss." (2024 Op. 13.) With the benefit of amendment, Plaintiffs point to statistics from the Rutgers Study, which "concluded that, when [] other potential predictive variables [(like demographic, educational employment, institutional, and community characteristics)] were controlled for, race/ethnicity still played a significant role in predicting the failure rate of a first time [LCSW] Exam test taker. (Pls' Opp. 2 (citing SAC ¶ 45).) Accordingly, the Court must determine whether the new statistics cure the deficiencies previously identified.

Specifically, Plaintiffs now cite statistics from the Rutgers Study that they assert "conclude[] that Black test takers were 5.193 times more likely to fail, and Hispanic/Latino test takers 2.009 times more likely to fail, than their [w]hite counterparts." (SAC ¶ 46.) These new statistics do not move the needle. First, these figures only concern first-time LCSW exam takers. (*See* Rutgers Study 27 (describing "a logistic regression analysis . . . to understand the effects of race/ethnicity on the likelihood of failing first-attempt Clinical exams").) Plaintiffs allege that, because 2022 pass rates for LCSW and LMSW are "similar," (*see* SAC ¶¶ 41–42), statistics produced using LCSW exam data from 2018 to 2022 are "likely" similar to that if produced using LMSW exam data, (*id.* ¶ 49). The Court declines to extrapolate the statistics in the way Plaintiffs ask, as doing so requires crediting too speculative an inference. Contrary to Plaintiffs' suggestion, it would not be "reasonable" to infer that a regression conducted with one dataset (LCSW exam pass rates from 2018 to 2022) would produce similarly statistically significant results when changing the entire underlying dataset (LMSW exam pass rates from 2018 to 2022). Finally, "[a] litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir 2018).

10

Second, the statistics are neither statistically significant nor "of a level that makes other plausible nondiscriminatory explanations very unlikely." *Burgis*, 798 F.3d at 69. In *Burgis*, the Second Circuit noted the "general rule" that "if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that [the alleged discriminatory action was taken] without regard to race would be suspect." *Id.* at 70 n.6 (quoting *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 208 n.14 (1977)); *see also I.S. by & through Disla v. Binghamton City Sch. Dist.*, 486 F. Supp. 3d 575, 606 (N.D.N.Y. 2020) ("Federal cases have recognized that statistical differences greater than two or three standard deviations provide an acceptable basis to infer discrimination." (quoting *Santiago v. Miles*, 774 F. Supp. 775, 799 (W.D.N.Y. 1991))), *aff'd sub. nom. Sanchez v. Binghamton City Sch. Dist.*, No. 24-CV-2125, 2025 WL 2372707 (2d Cir. Aug. 15, 2025); *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 263–64 (S.D.N.Y. 2018) ("Generally, results are deemed significant at around 2 standard deviations . . . ."); *Fergus v. City of New York*, No. 05-CV-3361, 2008 WL 11433197, at *14 (E.D.N.Y. July 2, 2008) ("While the Supreme Court and the Second Circuit have rejected an exact legal threshold at which statistical evidence, standing alone, establishes an inference of discrimination, most courts follow the conventions of social science which set two standard deviations 'as the level of significance below which chance explanations become suspect.'" (quoting *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 372 (2d Cir. 1989))), *report and recommendation adopted*, 2008 WL 11433198 (E.D.N.Y. July 29, 2008), *aff'd*, 331 F. App'x 888 (2d Cir. 2009).

The Rutgers Study notes that "race/ethnicity remained the most influential determinant of the ASWB [LCSW] exam outcome." (Rutgers Study 29.) Specifically, Black examinees' average score was roughly one standard deviation below that of white examinees and

11

Hispanic/Latino examinees' average score was less than one standard deviation below that of white examinees. (*See id.* 13.) This does not suffice to make other plausible nondiscriminatory explanations very unlikely. *Cf. E.E.O.C. v. Mavis Disc. Tire, Inc.*, 129 F. Supp. 3d 90, 111 (S.D.N.Y. 2015) (finding statistics presenting standard deviations ranging from two to ten sufficed to permit an inference of discrimination).[3] Accordingly, the Court concludes that Plaintiffs have failed to allege a Section 1981 claim and so it is dismissed.

3. <u>NYSHRL</u>

The Court now turns to Plaintiff's NYSHRL claim. In light of the Court's dismissal of Plaintiffs' federal claims under Title VII and Section 1981, the Court declines to exercise supplemental jurisdiction over their state-law NYSHRL claims. *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction."). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity, in deciding whether to exercise jurisdiction." *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (citation and quotation marks omitted); *accord Gibson v. Mount Vernon Montefiore Hosp. Exec. Dir.*, No. 22-CV-4213, 2024 WL 1217528, at *13 (S.D.N.Y. Mar. 19, 2024). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon*

---

[3] Plaintiffs spill much ink disputing the Court's discussion of the but-for causation standard in its 2024 Opinion. (*See* Pls' Opp. 19 n.4, 20 n.5.) To cut to the chase, the Court noted that Plaintiffs had cited to caselaw that predated more recent controlling cases that laid out the relevant standard. (*See* 2024 Op. 13 n.3, 15 n.4.) Plaintiffs' attempt to rehabilitate their legal analysis and reasoning is unavailing in light of the fact that discussion of the but-for causation standard is completely absent from their initial opposition brief. (*See generally* Dkt. No. 34.)

12

*Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) ("It is axiomatic that when all federal claims are eliminated prior to trial, a court should decline to exercise jurisdiction over any remaining pendent state claims." (quotation marks omitted)).

The Court concludes that there is nothing that distinguishes this Action from "the usual case." *See Cohill*, 484 U.S. at 350 n.7. Plaintiffs' federal claims have all been dismissed, *see Dellutri v. Village of Elmsford*, 895 F. Supp. 2d 555, 575 (S.D.N.Y. 2012) (declining to exercise supplemental jurisdiction where "th[e] case remains in its initial stages, and the [p]arties have not yet proceeded to discovery"); *Middleton v. United States*, No. 10-CV-6057, 2012 WL 394559, at *1 (E.D.N.Y. Feb. 7, 2012) (declining to exercise supplemental jurisdiction because no federal claims survived a motion to dismiss), and none of the factors that the Supreme Court enunciated—"judicial economy, convenience, fairness, [or] comity"—counsels against such dismissal, *Cohill*, 484 U.S. at 350 n.7. Thus, Plaintiffs' NYSHRL claims are dismissed.

### III.  Conclusion

For the reasons set forth above, the Motion is granted. Plaintiffs have amended their pleading twice, once after being put on notice of its deficiencies. *See Goldrich v. Masco Corp.*, No. 22-CV-3769, 2023 WL 2649049, at *10 (S.D.N.Y. Mar. 27, 2023) (rendering "the first adjudication of Plaintiff's claims on the merits"). "To grant Plaintiffs leave to amend would be allowing them a 'third bite at the apple,' which courts in this [D]istrict routinely deny." *Binn v. Bernstein*, No. 19-CV-6122, 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) (collecting cases), *report and recommendation adopted*, 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020); *see also Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 574 n.28 (S.D.N.Y. 2016) ("[T]he

13

[c]ourt has given [p]laintiff two bites at the apple, and there is no need for a third bite."); *cf. Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257–58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." (alteration adopted) (footnote and quotation marks omitted)). Plaintiff's SAC is therefore dismissed with prejudice. The Clerk of the Court is respectfully directed to terminate the pending Motion at Dkt. No. 41 and close the case.

SO ORDERED.

Dated:   September 25, 2025
         White Plains, New York

                                                          _____
                                                          KENNETH M. KARAS
                                                          United States District Judge